# Richmond.

Senger and als. v. Senger's Ex'or and als.

January 14th, 1886.

1. Wills—*Construction—Parol evidence—True enquiry.*—Wills are explainable by the light of surrounding circumstances. But a party seeking to maintain a devise, must show it by the will itself, and no defects in the language used can be supplied by parol proof. *The true enquiry is* not what the testator meant to express, but *what the words used do express. Burke* v. *Lee,* 76 Va. 386.

2. Idem—*Latent ambiguity—Parol evidence.*—The only exception to the rule excluding *parol* testimony as to the testator's intentions, is in cases of latent ambiguity ; which is where, for anything appearing on the face of the will, the intention is certain, but there is some collateral matter *de hors* the will, that causes ambiguity ; and extraneous evidence is admissible both to show the existence of the latent ambiguity and to remove it and disclose the testator's meaning. *Hawkins* v. *Garland,* 76 Va. 149.

3. Idem—*Meaning—Declarations.*—Testator's declarations that he intended to make, or had made, a particular bequest, are not admissible evidence to show the meaning of his will, except in cases of latent ambiguity. *Wooten* v. *Redd,* 12 Gratt. 196.

4. Idem—*Case at bar.*—In his will testator said : "It is my will that all my estate be equally divided between the children of my deceased son, J., and the children of my daughter, E., taking in consideration what I have already given them." And he adds : " As I have given to my daughter, E., $2,000 in land, it is my will that said sum be charged as that much advanced to her children out of my estate. And as I have given to her son, D., $600, and to A. and S., the children of my son, J., $1,722.50 each, as down payment on land I sold them, it is my will that these sums be taken as advancements

and charged as legacies out of my estate. It is my will that no interest be charged upon advancements already made, or upon legacies made in future. It is my will that, as fast as moneys come into my executor's hands, he pay out legacies to him or her, who is twenty-one years of age, who have received the least, until he or she is equal to the one who has already received, and they be carried along equally until all are equal, and that then the balance of my estate be divided equally between the children of my said daughter on the one hand, and the children of my deceased son, on the other hand:

HELD:

1. The children of the deceased son, J., and of the daughter, E., take the estate bequeathed them by their grandfather, the testator, *per capita.*

2. Parol evidence of declarations of the testator as to his intentions as to the disposition of his property, and as to what dispositions he had made of it, by his will, is inadmissible in this case, as no latent ambiguity is disclosed by proof. ·

3. The first of the two provisions of the will vest the legacies in each of the legatees immediately, whilst the second postpones the actual possession and command of the money until the legatee attains maturity.

Appeal from decrees of circuit court of Rockingham county, rendered October 17, 1884, and April 13, 1885, respectively, in the chancery cause of Daniel Senger's Executor against Senger's widow and heirs. Argued at Staunton, but decided at Richmond. The object of this suit was to have a judicial construction of the will, and a settlement of the estate of the testator, Daniel Senger, who died in 1882. The will made provision for his widow in lieu of dower, and was admitted to probate in the county court of said county at the August term, 1882. The widow renounced the will. The circuit court decreed that the four children of the testator's deceased son, Joseph Senger, and the nine children of the testator's daughter, Elizabeth R. Showalter, take the estate bequeathed them by the will, *per capita,* and that each legatee's share vest immediately in right with postponement of possession and control until the legatee attained

twenty-one years of age. From this decree the children of Joseph Senger, deceased, obtained an appeal to this court.

Opinion states the case.

*John E. Roller*, for the appellants.

*William B. Compton*, for the appellees.

· RICHARDSON, J., delivered the opinion of the court.

The will of Daniel Senger, deceased, contains really but one clause, there being no formal division into separate and distinct clauses, as is usually the case. The provisions thereof out of which this controversy arose are as follows:

"It is my will and desire that all of my estate be equally divided between the children of my deceased son, Joseph Senger, and the children of my daughter, Elizabeth R. Showalter, taking into consideration what I have already given them."  ·  ·

The testator then says: "And as I have given my daughter, Elizabeth Showalter, two thousand dollars, in land, it is my will that said sum of two thousand dollars be charged as that much advancement to the children of said Elizabeth Showalter, out of my estate. And as I have given to my grandson, Daniel P. Showalter, the son of Elizabeth Showalter, the sum of six hundred dollars; and as I have given to my grandson, Abraham Senger, and Susan C. Senger, the children of my deceased son, Joseph Senger, the sum each of seventeen hundred and twenty-two dollars and fifty cents, which I allowed them as down payment on a tract of land sold them, it is my will that these sums, mentioned above, shall be taken as advancements, and shall be chargeable as legacies out of my estate. It is my will and desire that no interest be charged upon advancements already made, or upon legacies made in

future. It is my will and desire that, as fast as moneys come into the hands of my executor, that he pay out legacies to him or her, who are twenty-one years of age, who has received the least, until *her* or she are equal to the one who has already received, and they be carried along equally until the next highest advancements, until all are equal, then the balance of my estate be divided equal between the children of my daughter on the one hand, and the children of my deceased son, Joseph, on the other hand."

After the execution of his will, the testator advanced Anthony, another son of Joseph, $1,722.50. On the day his will was executed, by writing under seal, signed by himself and his wife, the testator sold his tract of 172 acres of land to the said Abraham and Susan C., children of his son, for $11,180, of which sum $3,445 down payment was paid in part of their legacy, and the balance was payable in eight annual install-ments, to fall due respectively on the 1st of March, 1883, and of each of the seven succeeding years, with vendor's lien reserved.

The bill was answered by the defendants, the adults in per-son and the infants by *guardian ad litem.* An account was ordered, and the master reported that the accounts were prop-erly avouched; that the testator died owning no real estate, and that his personalty amounted to $20,572.56, including the advancements; that there were no debts due from the estate; that the legatees were the widow (who had renounced the will), the four children of Joseph Senger, deceased, all of age except Daniel, who would be on the 9th of October, 1884, and the nine children of Elizabeth Showalter, all, except Daniel and John, infants, who would come of age, Benjamin on 4th of January, 1884, David 26th of August, 1886, Ida 12th of December, 1889, Ursey 16th September, 1891, Hettie 12th of November, 1895, Martin 24th of January, 1898, and Annie

29th of June, 1900; and that the Senger legatees claimed that half of the whole estate for distribution should be divided equally among the four Senger children, and the other half among the nine Showalter children, that is, *per stirpes*; and that the Showalter legatees claimed that the whole should be equally divided among the thirteen grandchildren, that is, *per capita;* and he made alternate statements.

At the hearing of the cause, October 17th, 1884, the court decreed that the legatees took *per capita,* and not *per stirpes;* that after paying the debts and the costs, the executor should pay one-third of the residue of the estate to the widow, who had renounced the will, and should divide the balance equally among the grandchildren of the testator, taking into consideration the advancements, said money to be paid to such of them as were infants when they respectively arrived at twenty-one years of age; and recommitted the cause to the master to reform his report in accordance with the decree.    The master having reformed his report as directed and returned the same, on the 13th of April, 1885, the court confirmed the report and decreed that, after paying the expenses of the administration and the costs of the suit, the executor should pay one-third of the estate, as it comes into his hands, to the widow, and then pay to the said grandchildren, or to such of them as would be entitled to a distributive share, as they respectively arrived at twenty-one years of age, until all are made as nearly equal as the estate in his hands, or to come into his hands, would suffice to do so; and that he pay, first, Daniel Senger, $240, to make him equal with those who have received the smallest advancements, and then to such of the children of the daughter as are, or may be, twenty-one years of age, except Daniel, a sum which, together with their advancements of $240 each, would make the sum of $888 each, as of the 1st of February, 1885; and also to Daniel Senger a like sum, sufficient with his

$240 to make the sum of $888, before paying any others of the grandchildren anything, and then divide the remainder into ten equal parts, paying the same to the nine children of the said daughter, and to Daniel Senger, share and share alike; but if the estate should be sufficient in any event, to pay more to each of the last named ten grandchildren, then the sum of $1,860.30, received by the other three grandchildren, the children of Joseph Senger, then the executor should so distribute the same as to make all of the said grandchildren equal; and that after paying to the widow and to Daniel Senger certain sums respectively, of the amount then in the hands of the executor, he should then divide the residue thereof into eight equal parts, and pay to each of the children of said daughter, except Daniel, who may be twenty-one years of age, one-eighth thereof, and loan out the residue on good security, at six per cent., until said children become twenty-one years of age, paying to their guardian or guardians who might thereafter be appointed, annually the interest accruing on the loan. And the decree further directs that as fast as moneys come into the hands of the executor he shall apply the same according to the principles of the decree, until the widow shall have received her one-third of the estate, and the ten grandchildren aforesaid, the children of H. O. Showalter and wife, and Daniel Senger shall all be made equal, taking into consideration their advancements, &c.

At the hearing of the cause, the depositions of several witnesses taken in behalf of the Senger legatees, were read against the protest of the counsel for the Showalter legatees. John W. Crist, one of them, deposed that, at the instance of the testator, and from "a draft of a will" produced by him, he drew the last will of the testator, who told the deponent that he wished him to follow "the old draft," with the exception of these changes— "the name of the executor," "correction of calculations," and

" the property to go to his daughter's children instead of to herself;" deponent, without being directed so to do by the testator, omitted the words "on the one hand," after the words, "the children of my deceased son, Joseph Senger," and also the words "on the other hand," after the words, "the children of Elizabeth Showalter;" and that he omitted them because he thought those that remained would express the same idea. And he deposed further that the omitted words were in "the old draft"—and also that on that occasion he had, at the testator's request, made a calculation for him (a memorandum whereof in writing is filed with his deposition), by which it appeared that Mrs. Showalter having been advanced $2,600, and the amount to be divided being $8,580, a balance of $4,290 remained due her, of which the share of each of her nine children would be $476.66⅓, whilst the children of Joseph must have $2,600, added to their half of $5,580, which would be $6,890 for the four, or $1,722.50 each, and that $3,445 was allowed Abraham and Susan out of the down payment on the land as part of their legacy, and that bonds were to be given by them for the balance of the price of the land; that this calculation was the basis of the whole will, and that the testator wanted one-half of his estate given to each set of his grandchildren.

Several witnesses testified that the testator had told them, before he executed his last will, that he intended giving one-half of his estate to the children of his son, and the other half to the children of his daughter, and that after he had executed said will he told them that he had so bequeathed his property, and that he had altered his former will, which gave half of his property to his daughter herself, because he was displeased with the way her husband had treated two of the children who had married without his consent. And one of the witnesses deposed that he, too, had, a short time before the execution of the testa-

tor's last will, made for him, at his request, a calculation with similar results to the one made by the witness Crist, a memmorandum whereof is also made a part of his deposition.

From the said decrees Abraham Senger, Daniel Senger, Daniel T. Evers, and Susan C., his wife, formerly Susan C. Senger, obtained an appeal and *supersedeas.*

I. The clause of testator's will—the meaning of which, when ascertained, must mainly determine this controversy—is as follows: "It is my will and desire that all of my estate be equally divided between the children of my deceased son, Joseph Senger, and the children of my daughter, Elizabeth Showalter, taking into consideration what I have already given them."

At the threshhold we are met with the enquiry, does this language of the testator, the meaning of which is controverted, present a case for the admission of the parol testimony which was taken on behalf of the appellants? The rules determining the admission or rejection of parol and extraneous testimony to explain a bequest, depend upon a distinction which has been established between ambiguities which are patent and those that are latent. A patent ambiguity is one apparent on the face of the will. If the ambiguity occurs in the wording of a will, producing a palpable uncertainty on the face of the instrument, extrinsic evidence cannot remove the difficulty without putting new words in the mouth of the testator, and, in effect, making a new will for him. . In such case the only aid which can be brought to the construction of the bequest is by comparing it with other parts of the will, and thus ascertaining the true meaning and giving effect to the whole will, and every part thereof, if possible. On the other hand, a latent ambiguity is when the will presents no uncertainty on its face independently of the facts, and the uncertainty arises from evidence of something extrinsic, or by some collateral matter outside the will.

Lord Abinger, in *Hiscocks* v. *Hiscocks*, 1 M. & W. 367, says: "There is but one case in which parol evidence of intention can properly be admitted, and that is where the meaning of the testator's words is neither ambiguous nor obscure, and where the devise is, on the face of it, perfect and intelligible, but from some of the circumstances admitted in proof an ambiguity arises as to which of the two or more things, or which of the two or more persons (each answering the words in the will), the testator intended to express. Thus, if the testator devise his manor of S., and has two manors of north S. and south S., it being clear he means to devise one only, whereas both are equally denoted by the words he has used; in that case there is, what Lord Bacon calls, 'an equivocation;' that is, the words equally apply to either manor; and evidence of previous intention may be received to solve the latent ambiguity, for the intention shows what he meant to do; and when you know that, you immediately perceive that he has done it, by the general words he has used, which, in their ordinary sense, may properly bear that construction. It appears to us that in all other cases parol evidence of what was the intention ought to be excluded, upon this plain ground, that his will ought to be made in writing, and if his intention cannot be made to appear by the writing explained by the circumstances, there is no will."

*Shelton* v. *Shelton*, 1 Wash. 53, was the first case on this subject decided by this court. There the doctrine is laid down in accordance with the foregoing views. It was in that case held that parol proof is not to be admitted to contradict the common meaning or legal import of plain words in a will; but shall be allowed to explain a person or thing intended by doubtful words, or to correct mistakes in either description. In *Wooten* v. *Redd*, 12 Gratt., Lee, J., speaking for the court, said: "Declarations of the testator, as to his intention

to make a particular bequest, or that he had made such a bequest, is not competent evidence, except where the terms in the will, independently and without ambiguity, apply to each of several different things or persons, when evidence may be received as to which of the subjects or persons so described was intended by the testator." And the same doctrine was held in *Roy* v. *Rowzie,* 25 Gratt. 599. Staples, J., in *Burks* v. *Lee,* 76 Va. 388, says: "A party seeking to maintain a devise must show it by the will itself, and no defects in the language and in the instrument can be supplied by parol proof. The true inquiry is not what the testator meant to express, but what the words used do express." *Hawkins* v. *Garland,* 76 Va. 149, defines latent ambiguity and holds that extraneous evidence is admissible both to show its existence and to remove it. Redfield quotes Jarman as authority for the rule that extrinsic evidence is inadmissible to alter, detract from, or add to the terms of a will, or to vary the meaning of the words, and adds that the plain and unambiguous words of the will must prevail, and are not to be controlled or qualified by any conjectural or doubtful construction growing out of the situation, circumstances or condition either of the testator, his property or family. 1 Redf. 429 (third ed).

In *Robinson* v. *Allen,* 11 Gratt. 788, Samuels, J., said: "The language of the will itself must be relied on as the chief guide. If that language be ordinary and popular, its meaning is to be construed according to its usual acceptation; if technical, legal terms be used, they must be construed in the sense which the law affixes." Nor is the draftsman permitted to prove that he inserted or omitted words from the will, without the knowledge or consent of the testator, for that would be to set up a parol will, in the stead of the written testament, which has been made, published and probated. *Roseborough* v. *Hemphill,* 5 Rich. Eq. Ca. 95 (S. C.); *Gaither* v. *Gaither,* 3 Md. Ch'y Dec. 158.

But it is useless to multiply authorities. It is manifest, upon inspection of the language under consideration, that there is neither any ambiguity patent on its face, nor any latent ambiguity disclosed in it by the parol testimony produced by the appellants. The subject of the bequest is clearly expressed by words of the utmost comprehensiveness and perspicuity— "all my estate." The objects of the testator's bounty are designated by terms of equal perspicuity and definiteness—"the children of my deceased son, Joseph Senger, and the children of my daughter, Elizabeth Showalter." Both families equally near and dear to the testator, their common ancestor, the words used not being of technical signification, but words in common use and acceptation, and as used so unmistakably convey the idea that the testator's grandchildren, not as classes, but as individuals, should equally share his bounty; that mere artificial rules of construction are not only useless, but a resort to them would be an uncalled for intrusion upon the clear and vigorous common sense with which the testator has expressed his intention.

But the learned counsel for the appellants, with much ingenuity and ability, resorts to the subtleties of grammar and of punctuation to find something recondite and peculiar in the signification of a single word, the preposition "between," which, it is contended, clearly indicates an intention on the part of the testator to separate his own grandchildren, each and all equal objects of his natural affection and beneficence, into two classes, with the view of making a difference in his benefaction among them.

In *Crow* v. *Crow*, 1 Leigh, 85, Carr, J., says: "Look now at the words of the will: 'The balance of my slaves to be equally divided between my children, to-wit: the heirs of William Crow, namely, (enumerating his son, William Crow's children,) Thomas, Moses, John Crow (children of the testator,) and the

children of my deceased daughter, Nancy Jones, and the children of my deceased daughter, Sarah Crow.'" Now suppose the testator had stopped here, could there be any doubt that each of his children and grandchildren would take equally, *per capita*? With that learned and sagacious jurist the word "*between*" suggested no such idea of separation into distinct classes suitable for the application of the theory of a division *per stirpes*.

The learned counsel for the appellant, in his brief, institutes a critical comparison of the variant significations of the prepositions "between" and "among" when used in such connection as the former is used in the chiefly contested clause of the will under consideration. It is well known that the same words are often capable of different meanings according to their collocation and connections. And the same prepositions are, for the most part, differently used and placed and do then express different ideas. But when they follow the verb "*divide*," their general signification is very similar, and in popular use are considered synonymous; though "among" denotes a collection and is never followed by two of any sort, whilst "between" may be followed by any plural number, and seems to denote rather the individuals of the class, than the class itself generically. But, whatever importance may be attached to such philological refinements, it is certain that the general rule laid down in *Hoxton* v. *Griffith*, 18 Gratt. 574, settles the controversy as to this case. In that case at p. 577, Joynes, J., says : " where a bequest is made to several persons, in general terms indicating that they are to take equally as tenants in common, each individual will of course take the same share ; in other words, the legatees will take *per capita*. The same rule applies when the bequest is to one who is living, and to the children of another who is dead, whatever may be the relations of the parties to each other, or however the statute of

distribution might operate upon those relations in case of intestacy. Thus where property is given to my brother A., and to the children of my brother B., A. takes a share only equal to that of each of the children of B. So where the gift is to ' A.'s and ' B.'s' children, or to ' the children of A. and the children of B.,' the children take as individuals, *per capita.*" In the case under consideration we do not perceive anywhere in the context of the testator's will even the first glimpse of testatorial intention to take this case out of the scope and operation of the general rule above laid down. In view of the principles thus well settled, there appears to be little, if any, room to doubt the correctness of the decision of the circuit court that by the will of the testator, it was intended that each of his thirteen grandchildren should share his estate equally, that is *per capita. Brewer* v. *Opie,* 1 Call, 212; *Crow* v. *Crow, supra; McMasters* v. *McMasters,* 10 Gratt. 275.

Indeed, this view, so far from being weakened, is powerfully strengthened by an examination of the other clause of the will touching this same bequest: "It is my will and desire that as fast as moneys come into the hands of my executor, he pay out legacies to him or her who is twenty-one years of age who has received the least, until he or she are equal to the one who has already received, and they be carried along equally until the next highest advancements, until all are equal;" meaning, necessarily, all the legatees.

Taken altogether, the one controlling idea of the testator appears to be an equality of benefaction to these thirteen legatees, all of whom were of equal nearness and interest to him. Such was the general intent, and the minor purposes all appear to point in the same direction.

But it is also contended that the decree of the 13th of April is erroneous in another particular, to-wit: that it directs that these legatees, infants and all, shall be equalized in their

advancements now, when, as is contended, the will plainly declares that the executor shall make them equal or pay them, "as he or she becomes twenty-one years of age"—that is, the decree makes the legacies of the infants vest immediately, instead of postponing the vesting thereof until each becomes twenty-one years of age, and thus comes within the description required by the will.

The policy of the law is to favor the immediate vesting of estates, and they will be held to be vested unless very decisive terms of contingency are used in the will. The first clause of the will, quoted above, vests the share of each legatee in him at once. And where property is clearly given absolutely by one clause, the right thereto will not be limited or restricted by a separate clause, unless the language of the latter is equally clear and explicit as that of the former. If the benefit is to be taken away, it must be by express words or necessary implication. *Barksdale* v. *White*, 28 Gratt. 224.

The true construction of the two provisions is, that whilst the first vests the legacies in each of the legatees immediately, the second postpones the actual possession and command of the money until the legatee attains maturity. In the meantime the fund is under the control of the court. And this construction, the decree of April 13, 1885, practically carries into effect. There being no error in the decrees complained of, they are affirmed.

LEWIS, P., and HINTON, J., concurred in the opinion of RICHARDSON, J.

LACY, J., dissented.

FAUNTLEROY, J., dissenting, said:

I dissent from the opinion of the majority of the court just read.

Daniel Senger died in 1882, having made and published, on the 9th day of August, 1881, his last will and testament, which, after his death, was duly proven and admitted to record, or probate, in the county court of Rockingham county, at the August term thereof, in the year 1882; at which time, George W. Thomas, named as executor in said will, qualified as executor thereof. A controversy arising as to the construction of the said will, the executor, George W. Thomas, instituted this suit, in which he asked the circuit court to construe the said will, and to instruct him fully in regard to his duties and powers as executor of the said will.

The chief controversy arose under the clause in the will, in which the testator disposes of the remainder of his estate, after providing for the widow. The language used by the testator is, "It is my will and desire that all my estate be equally divided between the children of my deceased son, Joseph Senger, and the children of my daughter, Elizabeth Showalter, taking into consideration what I have already given them." The question is, is the estate to be divided *per capita*, or *per stirpes?* The circuit court decided that it is to be divided *per capita*.

There are *four* children of Joseph Senger, deceased, and there are *nine* children of Elizabeth Showalter. If the division of the estate be made *per stirpes*, each family, or class of children, will receive *one-half;* if divided *per capita*, the children of Joseph Senger, deceased, will receive only *four-thirteenths*, and the children of Elizabeth Showalter will receive *nine-thirteenths*.

If the clause in the will, already quoted, over which the controversy is made, were the only clause in the will, we think, the language used by the testator, taken in its grammatical and ordinary sense, imports that he recognized and established an antithesis *between the two families;* of his dead.

son on the one hand, and of his living daughter on the other; and that, by the clause, as he made it, he did divide and devise his estate *per stirpes* "*between*" the two sets or classes of his grandchildren; and, therefore, that the circuit court erred in construing the will as dividing the estate of the testator *among* all the devisees as an aggregate number *per capita,* instead of *between* the children of the testator's deceased son, Joseph, and the children of his living daughter, Elizabeth Showalter.    But this is not the only clause which throws light upon the question; on the contrary, the residuary clause, and the clause in regard to *advancements,* as well as the whole will, afford much more than a faint glimpse of the intention of the testator to devise his estate between the two families of his own two children, *per stirpes;* while the evidence in the record, which was properly admitted by the circuit court (not to alter, or vary, or add to, or contradict the terms of the will, but to aid the court to elucidate the intention of the testator, and to explain the ambiguity of the clause in controversy), leaves no doubt as to how the testator understood and construed his own will; and that he did, by his will, devise his estate between *two classes per stirpes,* and not *per capita.*

The language of the residuary clause, is—"between the children of my daughter, *on the one hand,* and the children of my deceased son, *on the other.*"    And the advancement of $2,000, which he had made to Mrs. Showalter, his daughter, he charges to her children, *as a class.*

In the case of *Wooten* v. *Redd,* 12 Gratt. 196, Judge Lee, speaking for this court, says: "In performing the duty of expounding a will, the court will make the amplest allowance for the unskillfulness and negligence of the testator; technical informalties will be disregarded; the most perplexing complications of words and sentences will be carefully unfolded; and the traces of the testator's intention will be diligently sought

out in every part of the instrument, and the whole carefully weighed together. Nor, in the performance of this duty, will the judicial expositor be confined to its mere contents. For an investigation into the state of facts, under which the will was made, will often materially aid in elucidating the scheme which the testator had in mind for the disposition of his estate. Hence he will endeavor to place himself in the situation of the person whose language he is called on to interpret, and, as this can only be done by the aid of extrinsic evidence, such evidence may be resorted to for the purpose of showing the situation of the testator and the state of his family, and of his property, at the time of making his will. And, generally, evidence may be received as to any facts known to the testator, which may reasonably be supposed to have influenced him in the disposition of his property, and as to all the surrounding circumstances at the time of making the will." (Wigram on Ad: of Ex. Evidence in Aid of the Interpretation of Wills, p. 11 *et seq.*, Proposition 5, p. 51 and 57; *Smith* v. *Bell*, 6 Peters R. 68; *Doe* v. *Martin*, 1 Nev. & Mann., 524; *Shelton* v. *Shelton*, 1 Wash. 53–56; *Kennon* v. *McRoberts*, 1 Wash. 96–102; *Ellis* v. *Merrimack Bridge*, 2 Pick. R. 243; *Brainerd* v. *Condry*, 16 Conn. R. 1.) See *Wooten* v. *Redd*, 12 Gratt. 205; 2 Matthews' Digest, 890; *Knick* v. *Knick*, 75 Va. 13; *Magers* v. *Edwards*, 12 W. Va. 822.

In *Knick* v. *Knick, supra*, Judge Burks, delivering the opinion of this court, after quoting from 1 Greenleaf's Evidence, section 275, the general rule "that parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument," said: "The writing is very ambiguous; and, without the aid of extrinsic evidence, it is very difficult, if not impossible, to give to it any safe or satisfactory construction. Without going into particulars, it may be said of the testimony in question, in general terms, that it establishes facts and cir-

cumstances which serve to explain the true intent and meaning of the instrument, without contradicting or varying its language. It shows the surrounding circumstances—the situation of the parties; their relation to each other and to the subject-matter of agreement, and the object and purpose of both parties in entering into that agreement, or avowed at the time it was prepared and executed; and it is not inconsistent with the terms in the writing to be construed. On the contrary, it furnishes light by which the court is enabled to discern the true meaning of these terms as the parties used them. Oral evidence, to this extent, is always admissible in the construction of written instruments where ambiguity exists." *Talbot* v. *R. & D. Railroad Co.*, 31 Gratt. 685–689, and cases there cited; *West* v. *Smith*, 11 Otto, and cases cited on pp. 263, 271, 272. Again: "a material portion of the testimony relates to the subsequent conduct of the parties, their conversations with each other, and the admissions of the appellee, which show the construction put upon the written agreement by themselves. This testimony was clearly admissible; for, although when the meaning of an instrument is *clear*, an erroneous construction of it, by the parties to it, will not control its effect; yet, where there is *doubt* as to the proper meaning of it, *the construction which the parties have put upon it* is said to be entitled to *great consideration.*" *Bank of Old Dominion* v. *McVeigh*, 32 Gratt. 530–541, citing *Railroad Company* v. *Trimble*, 10 Wall. 367–377.

For the purpose of putting the court in possession of all the facts and circumstances surrounding the testator at the time of making the will, sundry witnesses of unimpeached and unimpeachable character proved, by their testimony in the record, that the testator, Daniel Senger, had made at least one will, if not more, prior to the making of the will in controversy, in which he divided this estate into *two equal parts*, and gave one

part to Joseph Senger's children, and the other part to *his daughter, Elizabeth R. Showalter*, and her children. That but a few days before the making of the will in controversy, dated 9th of August, 1881, Daniel Senger, the testator, got William Beard, a well-known and intelligent citizen of Rockingham county, to prepare for him a complete draft of a will in which he divided his estate into two parts, and devised one of the parts to each family distinctively, as a class. In this draft of a will he discovered a mistake of six hundred dollars in some of the calculations, and he applied to a young Mr. Lee, a clerk in a neighboring store, to revise the calculation, telling him that "he must have another will written and have it in better shape, or Showalter will spur"—referring to Henry A. Showalter, the husband of his daughter Elizabeth, with whom he had some difficulty or misunderstanding.

In his old, or former will, he had given one-half of his estate to his daughter, Mrs. Showalter, and her children. In the rough draft (which is exhibit *"Draft"* in the record), prepared by Esquire William Beard, the same devise was provided for, and it was directed that all of the estate was to be equally divided, between Joseph Senger's children *" on the one hand,"* and Mrs. Showalter and her children *"on the other."* But Daniel Senger, the testator, thought that his son-in-law, Henry A. Showalter, was disposed to mistreat one or two of his children, who had married against his wishes, and the old man, after trying in vain to effect a reconciliation between Showalter and his children, and after having been, as he complained, treated rudely at Showalter's house—" *almost ordered out* "—determined then that "he did not want his property to go into the hands of such a man as Showalter manifested himself to be." And he determined to leave the part of his estate which would go to Mrs. Showalter, under his former will, directly to the children of Mrs. Showalter. Accordingly

with this declared purpose in view, he applied to J. W. Crist, the scrivener of the will in controversy, and instructed him to prepare the will, according to exhibit "*Draft*," which he gave him to go by, with three changes: 1st. Change of executor; 2d. Correction of the miscalculation of six hundred dollars made by Beard; and 3d. The property devised to go to Elizabeth Showalter's children, instead of to her. In copying the exhibit "*Draft*" the scrivener omitted the important words, "*on the one hand,*" which are in that draft immediately after the words, "the children of my deceased son, Joseph Senger"; and the equally important words "*on the other,*" after the words "the children of Elizabeth Showalter." He was not directed to omit these words by the testator; but left them out because he thought that the words which still remained would express the same idea.

The proof in the record is absolute and irresistible that the testator never intended to devise by the clause of his will in dispute *nine-thirteenths* of his estate to the children of his living daughter, Elizabeth Showalter, and only *four-thirteenths* to the children of his dead son, Joseph Senger; and the construction given to it by the circuit court to this effect is erroneous.

But, independent of the proof or significance of the surrounding facts and circumstances, looking at the context of the will, and the whole will, we find no difficulty in collecting the intention of the testator that the children of the deceased parent, Joseph Senger, should take, as a class, and that the estate should be divided *per stirpes,* and not *per capita.* In the case of *Hoxton* v. *Griffith,* 18 Gratt. 574, it is declared as the *general rule,* that " where a bequest is made to several persons in general terms, indicating that they are to take equally as tenants in common, each individual will, of course, take the same share; in other words, the legatees will take *per capita.*" The same rule applies where a bequest is to one who is living,

and to the children of another, who is dead, whatever may be the relations of the parties to each other, or however the statute of distributions might operate upon those relations in case of intestacy. The general rule above referred to, rests, indeed, upon a very slender foundation; and, Jarman says that it " will yield to a very faint glimpse of a contrary intention in the context." 2 Jarman on Wills (edition 1861), p. 182. " If, therefore, an intention can be collected from the will that the children of the deceased parent are to take *as a class*, that intention will prevail."

In *Hamlet* v. *Hamlet*, 12 Leigh, 350, the testator gave the residue of his estate to be equally divided *among* James Hamlet, Mary Jeffres, Patsy Wilson, Nancy Jeffres, Narcissa Jeffres (all of whom were children of the testator); the children of my son George Hamlet and Lucy, his wife; the children of my daughter, Elizabeth Arnett, the children of my son Bedford Hamlet, deceased, and the children of my daughter Obedience. The court held that the property must be divided *per stirpes*, each family of grandchildren taking one-ninth part. See *Gilliam* v. *Underwood*, 3 Jones Eq. R. 100; *Lockhart* v. *Lockhart*, 3 Jones Eq. R. 205 ; *Alden* v. *Beale*, 11 Gill, 123 ; *Lackland's Heirs* v. *Downing's Ex'or*, 11 B. Mon. R. 32; *Fissel's Appeal*, 27 Penn. R. 55; *Lowe* v. *Carter*, 2 Jones Eq. R. 377 ; *Miller's Appeal*, 35 Penn. St. 323; *Purnell* v. *Culbertson*, 12 Bush. 369; *Harris' Estate*, 74 Penn. St. 452 ; *Risk's Appeal*, 52 Penn. St. 269; *Lyon* v. *Acker*, 33 Conn. 222; Jarman on Wills, 195, note 2.

If the language used leaves it doubtful as to what the testator meant, he will be presumed to have intended the legatees to take as they would have taken under the statute of descents and distributions. 2 Jarman on Wills, 196; *Harris' Estate*, *supra*.

The circuit court erred in its decree of 13th April, 1885, in

directing that the legatees—infants and all—shall be made equalized in advancements *now*, when the will declares, explicitly, that the executor shall make them equal, or pay them "as he or she becomes twenty-one years of age."

The court erred in treating the legacies to the infants as already vested, and in now setting apart to each infant legatee his or her portion or proportion of the estate. Jarman on Wills, p. 854, lays down the rule as follows: "The vesting is obviously postponed where the attainment to a particular age is introduced into, and made a constituent part of, the discription or character of the objects of the gift; as where the bequest is to the children who shall attain, or to such as shall attain, the age of twenty-one years, there being in such case no gift except to the persons who answer the qualification which the testator has annexed to the enjoyment of his bounty. (So, where the bequest is to the children, if, or when, they attain the particular age.)"

The decrees complained of are, I think, erroneous, and for the reasons set forth, I dissent wholly from the opinion of the majority of the court in this case.

Decree affirmed.